520 F.Supp. 635 (1981)
In re COORDINATED PRETRIAL PROCEEDINGS IN ANTIBIOTIC ANTITRUST ACTIONS.
INTERNATIONAL RECTIFIER CORPORATION, et al., Plaintiffs,
v.
AMERICAN CYANAMID COMPANY, et al., Defendants.
Peter R. COHEN and Deborah D. Riordan as the Administratrix of the Estate of Edward Joseph Riordan, deceased, Petitioners,
v.
INTERNATIONAL RECTIFIER CORPORATION, Respondent.
Nos. M 19-93A, 4-71 Civ. 435, 4-74 Civ. 372 and 4-81 Civ. 273.
United States District Court, D. Minnesota, Fourth Division.
July 24, 1981.
*636 *637 *638 Dorsey, Windhorst, Hannaford, Whitney & Halladay by Peter Dorsey and Peter S. Hendrixson, Minneapolis, Minn., for petitioners.
Leonard, Street & Deinard by Allen I. Saeks, Minneapolis, Minn., Jenner & Block by Thomas P. Sullivan and Richard T. Franch, Chicago, Ill., and Irell & Manella, Los Angeles, Cal., for respondent.

ORDER AND MEMORANDUM
MILES W. LORD, Chief Judge.

I. INTRODUCTION AND CASE HISTORY
This proceeding commenced upon a Petition filed on May 28, 1981, by Peter R. Cohen (Cohen) and Deborah D. Riordan (D. Riordan) as administratrix of the estate of Edward J. Riordan (E. Riordan), deceased, against respondent International Rectifier Corporation (Rectifier).
Cohen and E. Riordan (C&R) represented Rectifier in the matter of International Rectifier Corporation et al. v. American Cyanamid Company et al., 69-2484 HP, (Cal.), 70 Civ. 180 (N.Y.) and 474 Civil 372 (Minn.) from December 16, 1969, to August 14, 1975 (the "main action").
The main action was first transferred from California to New York, as a "tagalong" case by the Multidistrict Panel, pursuant to 28 U.S.C. ง 1407 for coordinated and consolidated pretrial proceedings together with over one hundred other cases there pending and known as the broad spectrum antibiotics litigation, In Re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions. See In Re Multidistrict Civil Antitrust Actions Involving Antibiotic Drugs, 295 F.Supp. 1402 (1968). The majority of those cases were disposed of in a negotiated settlement which was approved and affirmed by the New York District Court. West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970), aff'd 440 F.2d 1079 (2d Cir. 1971). On November 30, 1970, Mr. Chief Justice Burger designated this Judge to the Southern District of New York, pursuant to 28 U.S.C. ง 292 et seq., and on December 2, 1970, the Multidistrict panel assigned all of the sixty "non-settling" cases to this Court for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. ง 1407(b). In Re Antibiotic Drugs, 320 F.Supp. 586 (Jud.Pan.Mult.Lit. 1970); Pfizer Inc. v. Lord, 447 F.2d 122 (2d Cir. 1971). The main action was one of the "competitor cases" thereby assigned to this court. In Re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, CCH 1972 Trade Cases 93,067 (D.Minn.1971). On May 17, 1971, this Court transferred the majority of the "non-settling" cases to the District of Minnesota for trial before this Court under 28 U.S.C. ง 1404(a). The basis of this Court's decision was that the convenience of the parties and witnesses and the interests of justice would be served by that transfer. This Court was affirmed in so doing. Pfizer Inc. v. Lord, 447 F.2d 122 (2d Cir. 1971). During coordinated and consolidated discovery proceedings before this Court, C&R were among the most active, if not the most active lawyers, in preparing the liability issues common to all cases for trial. On July 11, 1974, this Court transferred the main action to the District of Minnesota for trial, and on August 1, 1974, this Court consolidated the main action for trial with five other cases then set before this Court for trial. That consolidated trial began on November 18, 1974.
Prior thereto, four independent patent infringement actions instituted in the Central District of California against Rectifier, two by Cyanamid and two by Pfizer, (the "related actions"), were transferred to this Court by the Multidistrict Panel for coordinated and consolidated pretrial proceedings. One of those actions, entitled Pfizer Inc. v. International Rectifier, 73-58-R (Cal.); 4-73 Civil 188 (Minn.) (1973) (the "doxycycline case"), charging Rectifier with infringement *639 of U.S. Patent No. 3,200,149 (the "doxycycline patent") was transferred to this Court by the Multidistrict Panel on March 12, 1973, for such coordinated and consolidated pretrial proceedings, In Re Antibiotic Drugs Antitrust Litigation, 355 F.Supp. 1400 (Jud.Pan.Mult.Lit.1973), on the grounds, among others, that:
... the antitrust allegations asserted as a defense to Pfizer's infringement action involve issues already raised in the so-called "competitor actions" brought against Pfizer and others, which are pending in the transferee court. To this extent, the doxycycline action in California presents issues of fact common to the proceedings in Minnesota.
... [W]e do not agree with plaintiff that, if its action is transferred to Minnesota, its attempt to enforce its patent will become "bogged-down" in the consolidated proceedings. Rather, we are convinced that the transferee judge, who has extensive familiarity with the issues and the parties involved in this litigation, is in the best position to schedule the necessary discovery ... with a minimum of delay and inconvenience to all parties concerned.
Id. at 1401-02.
C&R represented Rectifier in the four independent actions so transferred to this Court, and the doxycycline action consumed a substantial amount of this Court's time and effort during the coordinated and consolidated pretrial proceedings and even during the trial of the consolidated cases. Pfizer Inc. v. International Rectifier Corp., 182 U.S.P.Q. 595 (D.Minn.1974); Pfizer Inc. v. International Rectifier Corp., CCH 1975 Trade Cases (D.Minn.1975); Pfizer Inc. v. International Rectifier Corp., 186 U.S.P.Q. 511 (D.Minn.1975); Pfizer Inc. v. International Rectifier Corp., 538 F.2d 180 (8th Cir. 1976). In one of those cases, this Court said:
The commonality of issues in this patent infringement case and the other cases involved in these coordinated proceedings ... makes this Court the most efficient and practical forum for deciding the issues raised. In addition, this Court has acquired considerable background knowledge of both the issues and the proceedings before it. It would be impractical, therefore, to permit a situation to continue where the efforts of the principal counsel [C&R] in the patent infringement case would be split between a determination of issues in this Court, and the determination of some of the same issues in another forum.
Such a division of effort would irreparably injure the Defendants [e. g., Rectifier] in this case by subjecting them to duplicative proceedings, unnecessary expense, and impairment of their ability to prepare for trial. Moreover, it would also cause some hardship and delay to many of the other related cases consolidated with this one for pretrial preparation.
. . . . .
Because Pfizer has failed to establish that it would suffer injury, there appears to be no reason to risk the impairment of this Court's jurisdiction, the harm to Defendants, and the delay of this and many other related actions before the Court by denying the injunction requested by Defendants.
In addition, the Court also finds that Pfizer's decision to proceed in a new forum ... amounts to forum shopping. It is an effort to circumvent this court's jurisdiction ... the forum it initially chose .... This forum shopping appears to be a method of doing one of two things:
Either delaying the present proceedings ... which are before this Court, or frustrating them entirely and taking the power which is legally assigned to this Court when the matters are properly before this Court for adjudication and frustrating the efforts of the Court to arrive at an effective resolution of the problem.
. . . . .
This Court has authority to enjoin a party from proceeding [in another forum] when it has first obtained jurisdiction of the case. Such an injunction may issue when, as here, it is necessary to prevent *640 the waste and duplication of effort involved in twice trying the same issues .... This Court has the power, therefore, to prevent a party from engaging in conduct which would destroy the status quo or impair this Court's ability to render an effective judgment and award meaningful relief.
182 U.S.P.Q. 595.
The main action, and the five other cases consolidated for trial therewith, proceeded in trial before this Court from November 18, 1974, to August 14, 1975, when the main action settled. As this Court said in In Re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, CCH 1976-2 Trade Cases, 69,775:
In order to conserve judicial time, the [six] cases were consolidated to be tried before two juries. The competitor cases were to be tried to one jury while the United States Government case along with other purchasers (the Union Health and Welfare cases, the Mutual of Omaha case and the California Physicians Service case) were to be tried to another jury.
. . . . .
Eight months after the start of trial International Rectifier settled. (International Rectifier et al. v. American Cyanamid Co. et al., 4-74 Civil 372) ... for $33 million ....
In January of this year [1976], the Mutual of Omaha case and the Malcolm-Gregg case also settled. (Mutual of Omaha v. American Cyanamid Co. et al., 4-71 Civil 6; Malcolm-Gregg Co. Inc. et al. v. Chas. Pfizer & Co. Inc. et al. Civil 4-74-373).
. . . . .
This Court has received a special mandate to conduct this litigation "with scrupulous fairness and impartiality." ... Pfizer v. Lord, 456 F.2d 542 [532] (8th Cir. 1972), cert. denied, 406 U.S. 97 [976, 92 S.Ct. 2411, 32 L.Ed.2d 676] (1972).
After the main action settled, C&R were retained as special trial counsel by the plaintiffs and their counsel in the Mutual of Omaha class action cases and also by the plaintiffs and their counsel in the Union Health and Welfare class action cases. C&R were thereupon substituted in as co-counsel of record in those cases and represented those class action plaintiffs until those cases settled in January and February of 1976, the former for $12.5 million and the latter for $4 million.
In September of 1973, prior to the start of the trial in the Rectifier main action and the five other consolidated cases, the six non-settling state cases settled. In this Court's decision in In Re Coordinated Pretrial Proceedings, etc., 410 F.Supp. 706 (D.Minn.1975), this Court in fixing and setting attorneys' fees for counsel for those six state plaintiffs stated that:
In February of 1973, depositions commenced. Over 400 depositions were taken in this case, in all parts of the United States, Europe, Australia and Hong Kong. Many of these depositions were taken directly by the CCS [City, County, State] Plaintiffs. Others were taken by the PNSC [Plaintiffs' National Steering Committee]. In the long run, all of the discovery efforts conducted by the PNSC were helpful to all of the Plaintiffs and were contributed to by all Plaintiffs.
Id. at 710-711.
... The Court feels that these particular private attorneys have fulfilled their role as private attorneys-general in a very able and capable fashion.
. . . . .
Accordingly, the Court is going to award fees to both the Attorney General of the State of California and to the Attorney General of the State of Oregon as if they were private lawyers.
Id. at 717.
The role of the United States government attorneys and counsel for International Rectifier Corporation, a competitor, also contributed to the result. [emphasis added]
Id. at 722. The Court was, again, there referring to C&R.
C&R conducted the majority of the 400 depositions concerning the common liability *641 issues and also took the lead with respect to the non-settling plaintiffs' joint sets of interrogatories to the antitrust defendants. C&R's role in pretrial and trial activities contributed to, not only the settlement of the farm cases and the state cases, but also to the settlement of the Union Health and Welfare cases and the Mutual of Omaha cases. C&R did not petition for any fees or costs in the farm cases, the state cases, or any of the other cases which were disposed of in the Court. The various members of the PNSC, however, reimbursed Rectifier for a percentage of out-of-pocket costs incurred by Rectifier in financing common discovery conducted by the PNSC for the benefit of all nonsettling plaintiffs. In mid-1976, after the Rectifier main action was settled and dismissed, and upon Rectifier's Petition for relief, this Court enforced the PNSC agreement requiring reimbursement of certain financing costs to Rectifier against Continental Vitamin. Rectifier did not assert at that time that this Court had no continuing or ancillary jurisdiction to do so, but then asked for and received the aid of this Court.
In April of 1976, C&R petitioned this Court for reasonable fees and costs in representing the Mutual of Omaha class action cases and the Union Health and Welfare class action cases as special trial counsel between August 1975 and February 1976. This Court awarded C&R $300,000 in the Mutual of Omaha cases and $100,000 in the Union Health and Welfare cases on C&R's representation and the Court's understanding that C&R would receive fair compensation for its services as special trial counsel when the total of $400,000 awarded in those cases was considered in conjunction with the contractual contingency fee Rectifier agreed to pay to C&R for its services. See Farmington Dowel Products Co. v. Forster Mfg. Co., 421 F.2d 61 (1st Cir. 1969).
C&R's May 28, 1981, Petition sought to invoke the ancillary jurisdiction of this Court to resolve a fee dispute between C&R and Rectifier arising out of Rectifier's employment of C&R pursuant to a May 16, 1974, letter agreement between Rectifier and C&R. It is asserted by C&R and admitted by Rectifier in its "Motion for Stay of Temporary Restraining Order," filed in the United States Circuit Court of Appeals, Eighth Circuit, on June 12, 1981, and denied by that Court without prejudice on June 15, 1981, that "the litigation out of which the escrow arose did occur in Minnesota." C&R's Petition and their affidavits filed herein make it clear beyond question that the instant fee dispute arose out of the C&R-Rectifier May 16, 1974, fee agreement letter which contemplated the start of the trial of the main action in this Court before the end of 1974 and the performance of that agreement by C&R in this Court, and escrow instructions entered into between C&R and Rectifier on September 15, 1975, pursuant to that fee agreement whereunder C&R posted their 8พ% bonus fee, amounting to approximately $2.4 million, in escrow as security for the indemnity set forth in the fee agreement letter.
C&R's Petition and other moving papers filed herein recite the following factual chronology. In 1969, Rectifier retained the Beverly Hills, California law firm of Rosenfeld, Meyer and Susman (RM&S) in order to obtain the legal services of Cohen and E. Riordan in the contemplated main action. Rectifier so retained RM&S on March 12, 1969, pursuant to a written 1/3 contingent fee agreement signed by Cohen for RM&S and by E. Lidow for Rectifier. On April 30, 1974, C&R withdrew from RM&S. On May 14, 1974, Rectifier, which had retained Kaplan, Livingston, Goodwin & Selvin, concerning the break-up of RM&S, and with that firm's advice and counsel, discharged RM&S and terminated the RM&S-Rectifier fee agreement. On May 16, 1974, Rectifier, again with the advice and counsel of the Kaplan firm, retained C&R, who had then formed the firm of Cohen and Riordan to represent Rectifier in the main action and the related actions during the pendency of the main action. That letter agreement provides, in part that:
This letter will serve to confirm our fee agreement with respect to the above entitled action ("said action"), all other actions filed in the United States relating *642 to broad spectrum antibiotics (BSA's) which are now or hereafter may be pending during the pendency of said action, and the Tariff Commission proceeding now pending between Pfizer and you ("the related actions").
C&R shall devote substantially all of Edward J. Riordan's ("EJR") and Peter R. Cohen's ("PRC") professional services to said action (and during a trial anticipated to commence in the fall of 1974, all of their services) so long as the same are reasonably necessary to the proper prosecution of said action, such services to be rendered until the conclusion of said action, whether by final judgment or settlement.
C&R shall receive for their services in said action and the related actions (during the pendency of said action) the following:
A. You shall pay C&R the sum of $250,000.00 per year, prorated for any part of a year....
. . . . .
C. Eight and three-quarters percent (8พ%) of the net amount recovered by you in said action, less all sums paid by you to us pursuant to subparagraphs A and B above. For the purposes of this subparagraph, "net amount recovered by you shall be computed as follows:
(1) The gross amount recovered by you in said action shall be that cash amount which you recover and actually receive by way of final judgment or settlement, including attorneys' fees, less any amount awarded to any defendant in said action or the related actions.
(2) From the gross amount recovered by you there shall be deducted:
(a) All out-of-pocket costs and expenses paid or payable by you to C&R pursuant to paragraph 3 below.
(b) All costs and expenses paid or payable by you to others pertaining or relating to said action and the related actions.
(c) All amounts heretofore paid by you to Marc S. Gross, Hubbell, Cohen & Stiefel and Rosenfeld, Meyer & Susman for services rendered in said action and the related actions.
(d) For the purpose of assuring you that sufficient funds will be available to satisfy the indemnity and hold harmless provisions set forth in paragraph 4 below, within thirty (30) days of your receipt of the net amount recovered by you from any settlement or judgment in said action, you shall place eight and three-quarters percent (8พ) thereof in an interest-bearing escrow account, to there remain (except for accrued interest, which we may withdraw) until the later of (i) the final resolution of any proceeding involving any claim referred to in paragraph 4 below, or (ii) one (1) year following the date of such receipt.
. . . . .
(4)(a) Up to the limit of any amounts payable to us pursuant to paragraph 2c above, provided the total fees agreed to be paid by you to any other counsel you may engage to represent you along with us in said action do not exceed six percent (6%) of the net amount recovered by you, we will indemnify you against and hold you harmless from any and all claims by anyone other than parties to this agreement, or liability, loss, cost or expense directly or indirectly arising out of your employment of us or out of the execution or performance of this agreement to the extent that such liability, cost or expense exceeds thirty-three and one-third percent (33 1/3 %) of the gross amount of money received by you by way of final judgment or settlement, including attorneys' fees recovered, less court costs recovered in said action.
(b) The indemnity and hold harmless provisions set forth in paragraph 4(a) shall not apply to any decision obtained in any arbitration proceeding (whether or not confirmed by a court of competent jurisdiction) or to any settlement with any such third party unless we consent in writing to such arbitration or settlement prior thereto. [emphasis added]
*643 On May 17, 1974, C&R were substituted of record in the main action and the related actions were all before this Court. The main action sought to invalidate, specifically, the Jukes Patent involved in American Cyanamid Co. v. International Rectifier Corp., 71 Civil 2683, and the doxycycline patent involved in Pfizer Inc. v. International Rectifier Corp. et al., 4-73 Civil 188 (Minn.) and to render all broad spectrum antibiotic patents unenforceable for various alleged violations of the federal antitrust laws, (15 U.S.C. งง 1, 2 and 14), and sought over $100 million in single damages.
As noted above, the main action began trial together with the other five actions consolidated for trial before this Court on November 18, 1974. On August 14, 1975, the Rectifier case was settled for $33 million. That settlement included the settlement of three of the four related actions for royalty-free licenses, but excluded the doxycycline case and the main action which was pleaded as an affirmative defense therein from that overall settlement. The settlement amount of $33 million included an unspecified amount for Rectifier's attorneys' fees and Rectifier's costs which were also unspecified. The doxycycline case was then on appeal by Pfizer Inc. from this Court's partial summary judgment of July 16, 1975, holding the doxycycline patent to be invalid. Pfizer Inc. v. International Rectifier Corp., 186 U.S.P.Q. 511 (D.Minn.1975).
The settlement agreement and the dismissals with prejudice of the main action and the related actions (other than the doxcycline case) were filed and lodged in this Court together with a side letter dated August 12, 1975, from all defendants to Rectifier stating:
It is the understanding of the Defendants that neither the "settlement agreement" nor the stipulation of dismissal with prejudice in this case is intended to affect one way or another whether the United States District Court for the District of Minnesota would have jurisdiction to hear or resolve any claim against Rectifier which is based upon or related to the filing, prosecution or settlement of this case and which is made by any attorney or law firm who has been, or may claim to have been, counsel for Rectifier or for any of the other "parties of the first part" [Rectifier affiliates] to the settlement agreement. [emphasis added]
The settlement agreement provides in paragraph 12 that:
The parties of the first part [Rectifier] shall jointly and severally indemnify and defend each and any of the parties of the second part [the antitrust defendants], and hold them harmless, from any and all claims, controversies, disputes, differences, actions or judgments which may be asserted by any attorney or any law firm ... claiming, or who may claim, to have been counsel for any of the parties of the first part [Rectifier] and to have any lien, interest or any other claim of any nature whatsoever upon the claims herein settled or the proceeds thereof, the sums being paid in settlement, or the civil actions being settled. The parties of the second part [the antitrust defendants] shall promptly notify the parties of the first part [Rectifier] of any such claim.
C&R's verified Petition asserts that the side letter was intended to reserve this Court's ancillary jurisdiction over all Rectifier attorney-client fee disputes, including the C&R-Rectifier dispute raised by the Petition, while at the same time terminating this Court's jurisdiction over the antitrust defendants for any such dispute to the extent that the parties could control that jurisdiction. Rectifier has not offered any verified explanation for the side letter, but in argument of counsel has relied upon the phrase "to affect one way or another" to mean that Rectifier and its attorneys intended to forego ancillary jurisdiction over any later attorney-client fee dispute in this Court.
On August 15, 1975, the antitrust defendants paid the sum of $33 million to Rectifier by federal wire transfer. In September of 1975 Rectifier and C&R created an escrow account at the Security Pacific National Bank (the "California Bank") to carry out the intent of the "interest bearing escrow *644 account" provided for by Paragraph 2.C.(2)(d) of the C&R-Rectifier fee agreement. Paragraph 2.C.(2)(d) requires that:
... within thirty (30) days of your receipt of the net amount recovered by ... settlement or judgment in said action [which is the main action] [Rectifier] shall place eight and three-quarters percent (8พ%) thereof in an interest bearing escrow account to there remain (except for accrued interest, which [C&R] may withdraw).
Paragraph 2.C.(2)(d) also provides that the purpose of the interest-bearing account is to provide "sufficient funds" for the C&R "indemnity and hold harmless provisions set forth in paragraph 4."
Paragraph 2.C.(2)(d) of the C&R-Rectifier fee agreement therefore required creation of the interest-bearing escrow account, or escrow, for the purpose of C&R posting their 8พ% bonus fee as security that C&R would have sufficient funds for the paragraph 4 indemnity expressly referred to in paragraph 2.C.(2)(d), which indemnity is limited by paragraph 4(a) to the amount of the 8พ% bonus fee.
The Court therefore notes at the outset that the escrowed funds are the property of C&R, not Rectifier, and that Rectifier has no right to any part of the escrowed funds until and unless an indemnity event occurs.
The September 15, 1975, Escrow Instructions required Rectifier to deposit therein by September 18, 1975, the sum of $2.4 million and either add to or receive back a sum which, by March 1, 1976, Rectifier and C&R would agree to "as a result of the final accounting agreed to" between Rectifier and C&R regarding C&R's 8พ% bonus fee. By March 1, 1976, Rectifier and C&R had entered into that final accounting and since that date the escrow has contained the sum of $2,450,518 pursuant to the Rectifier-C&R final accounting. Under the terms of the Escrow Instructions, C&R have invested the principal amount of $2,450,000 in authorized securities and have received all of the income and interest derived from that principal amount, as provided in the Escrow Instructions and also as provided in paragraph 2.C.(2)(d) of the fee agreement letter. The Escrow Instructions also provide that the California Bank shall not be concerned with the C&R-Rectifier fee agreement's terms, but shall pay over the principal amount of $2,450,518 as directed by Rectifier and C&R upon final determination of certain related matters referred to in the C&R-Rectifier fee agreement.
By their verified Petition and by affidavit, C&R state that the paragraph 4 indemnity was intended to cover any liability imposed upon Rectifier by a trial court judgment in the expected suit by RM&S for the one-third contingency fee or for quantum meruit, i. e., an attorneys' fee award recovered by RM&S if when added to C&R's fee of $250,000 per annum and their 8พ% contingent bonus fee, exceeded the one-third contingent fee as defined in the RM&S-Rectifier fee agreement. C&R assert that the indemnity of paragraph 4 was intended by the parties to insure that the policy of Fracasse v. Brent, 6 Cal.3d 784, 100 Cal.Rptr. 385, 494 P.2d 9 (1972), would not require Rectifier to pay more than one-third of any recovery in the main action to its former and present attorneys, and that to the extent that any trial court judgment for RM&S plus C&R's fees exceeded that one-third, C&R would pay to RM&S from the escrowed 8 3/43;% or $2.45 million, so much as was necessary to insure that Rectifier paid only a total of one-third for all attorneys' fees to the conclusion of the main action. C&R also state that C&R's 8พ% bonus fee "... would under no circumstances ever be paid to Rectifier, but upon final resolution of the expected RM&S suit, would be paid, in whole or in part, either to C&R or to RM&S," by C&R's and Rectifier's instructions to the California Bank.
On October 15, 1975, RM&S instituted suit in the Superior Court of the State of California in and for the County of Los Angeles (the "California trial court") against Rectifier and C&R. RM&S's first count was on the RM&S-Rectifier contingent fee contract and sought to recover the one-third contingent fee. RM&S's second count alternatively sought quantum meruit. *645 Both the first and second counts were against Rectifier only. RM&S's third count alleged that C&R had wrongfully dissolved the at-will RM&S partnership and sought to recover all fees that Rectifier had paid to C&R โ the annual $250,000 and the 8พ% contingent bonus fee. The RM&S fourth and fifth counts pleaded that C&R had induced Rectifier to discharge RM&S and that Rectifier had induced C&R to dissolve the RM&S partnership, respectively.
The RM&S case began trial in the California trial court in March 1980. At that time, all of RM&S's counts had been dismissed except the quantum meruit count against Rectifier only and the separate inducement count against C&R only. In June 1980, the inducement count was dismissed by the California trial court by nonsuit at the close of RM&S's case in chief. RM&S appealed therefrom and that appeal is pending in the District Court of Appeal of the State of California, Second Appellate District (the "California appeals court"). In July 1980, RM&S received a (approximately) $4.4 million jury verdict on the quantum meruit count, to which the California trial court added (approximately) $1.5 million in prejudgment interest and thereafter entered a total judgment for (approximately) $5.9 million. On the last day permitted for appeal, Rectifier appealed to the California appeals court from the $5.9 million judgment. After the time for a direct appeal had expired, but within the time provided for a cross appeal, RM&S appealed and protectively cross appealed from all previously dismissed counts but did not appeal from the $5.9 million judgment recovered against Rectifier on its second count. Thus, if Rectifier had not appealed on the last day, RM&S's cross appeal thereafter would have been a nullity and the $5.9 million judgment would have become final for all purposes.
On January 19, 1981, C&R demanded in writing that Rectifier instruct the California Bank to release the principal amount of the escrowed funds asserting that (1) the terms of the paragraph 4 indemnity so required because the $4.4 million RM&S judgment (with or without interest and with or without Rectifier's reasonable fees, which were not covered by the indemnity) did not trigger the indemnity, and (2) the paragraph 4 indemnity by its terms, and as interpreted by California case law, ended the indemnity when a trial court judgment failed to reach and therefore to trigger the indemnity in whole or in part.
On February 22, 1981, Rectifier refused in writing to instruct the California Bank to release the escrowed funds asserting that the paragraph 4 indemnity remained in effect even if RM&S was willing to accept a California trial court judgment and only Rectifier appealed to improve upon that judgment and even though Rectifier's appeal could only benefit Rectifier. Rectifier further asserted that if its appeal resulted in a new trial and ultimately a larger judgment for RM&S which did reach the C&R indemnity, that C&R would then have to instruct the Security Bank to pay the escrowed funds to RM&S, up to the whole thereof depending on the amount of the RM&S judgment. Secondly, Rectifier asserted that although the paragraph 4(a) indemnity did not cover any adverse result in the doxycycline case, paragraph 2.C.(1) requires that any monetary judgment against Rectifier in the doxycycline case, which occurred after the settlement of the main action, required a "recomputation" of C&R's 8พ% bonus fee and that therefore C&R had impliedly also indemnified Rectifier against any future adverse judgment in the doxycycline case. Thus, according to Rectifier, if Pfizer were to recover a $33 million judgment against Rectifier in the ongoing doxycycline case, $33 million would be first deducted from the $33 million recovered by Rectifier in settlement of the main action, resulting in a zero net recovery in the main action and C&R's 8พ% bonus fee would be 8พ% of zero. In addition, Rectifier asserted that all fees after the August 1975 settlement of the main action and which were thereafter paid to all counsel representing Rectifier in the doxycycline case, together with all costs incurred, would also reduce the $33 million recovered by settlement of the main action. Thus as *646 Rectifier's counsel explained it during a settlement discussion between the parties, and which this Court encouraged by its Order of June 4, 1981, the C&R 8พ% or $2.45 million in escrowed funds, was an "indemnity-insurance policy" for any future adverse monetary judgment, and for all fees and costs incurred in the doxycycline case.
It thus appears to be Rectifier's position that (1) Rectifier can gamble C&R's 8พ% bonus fee in an appeal and/or a retrial of the RM&S case and (2) that the C&R bonus fee was also intended to pay Rectifier's attorneys' fees and costs in the doxycycline case after the main action concluded and the C&R-Rectifier fee agreement also concluded in August of 1975, and that C&R also indemnified Rectifier against an adverse judgment in the doxycycline case.
After the main case settled in August 1975 and the Mutual of Omaha cases and the Union Health and Welfare cases settled in January-February 1976, the other two consolidated trial cases were also settled and the United States government's civil case proceeded alone until a mistrial was declared by this Court on August 16, 1976, United States v. Pfizer, Inc., 4-71 Civil 403 (D.Minn.), In Re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions. CCH 1976-2 Trade Cases 69,774.
On June 16, 1976, the Eighth Circuit Court of Appeals reversed this Court's partial summary judgment in the doxycycline case, on the ground that there were triable issues of fact, and remanded the case for a trial of the factual issues presented thereby.
At the time of the Eighth Circuit's mandate, there was no broad spectrum antibiotic case pending before this Court, the United States' case and the foreign government cases having been reassigned by the Multidistrict Panel to the District Court in Philadelphia. Thereafter, the doxycycline case was transferred by the Multidistrict Panel to the Central District of California to be consolidated and coordinated with another case against Pfizer Inc. pending in that district. Judge M. Pence of the District of Hawaii was assigned to sit in the Central District of California for those cases.
In September of 1975, Rectifier and C&R orally agreed that C&R had fully performed the May 16, 1974, C&R-Rectifier fee agreement, that the escrow instructions creating the escrow at the California Bank would result in a final accounting between them not later than March 1, 1976, for C&R's bonus fee of 8พ% and that C&R's bonus fee would be escrowed as security for C&R's indemnity in the RM&S case. After September of 1975, Rectifier paid C&R an hourly rate pursuant to that oral agreement.
In June 1980, the California District Court held the doxycycline patent to be valid. On November 11, 1980, Cohen and Ehrmann (successor to Cohen & Riordan) were substituted out of the doxycycline case at their request because of their refusal to be responsible for legal and strategy decisions which were being made contrary to their advice.
On September 3, 1980, the California District Court issued a preliminary injunction enjoining Rectifier from further offering for sale or selling doxycycline. The transcript of that hearing, which the parties jointly submitted herein as an exhibit, shows that the District Court, in issuing that injunction, stated that if Pfizer Inc. could defeat the antitrust affirmative defense, which had not been tried, damages awarded against Rectifier might be more or less than $51 million, but would be "very, very substantial." That Court said:
They talk about $51 million, and I am not talking about $51 million. It may be more than that, it may be less than that. I am not here at this time necessarily [determining what] the damages of Pfizer might be. I simply say that it is a very, very substantial amount that potentially Pfizer [will] secure by way of judgment from Rectifier, if they are successful in surviving the attack on their [Pfizer's] monopoly by virtue of the charges of misuse and abuse.
Rectifier's spokesman at that hearing, Mr. Blecher, conceded that a judgment in that amount or a fraction of that amount *647 would bankrupt Rectifier. After that hearing, and after Cohen & Ehrmann withdrew from and were substituted out of the doxycycline case, and against Cohen's advice and without C&R's consent, (1) Rectifier voluntarily dismissed the antitrust affirmative defense; (2) voluntarily dismissed its pending appeal from the preliminary injunction; and (3) agreed to commence discovery on and to try the damage issues before the Court of Appeals decided the patent validity issues.
The facts set forth above appear from the verified Petition and the affidavits filed on behalf of C&R in support of this Court's ancillary jurisdiction and the Court's temporary restraining orders and preliminary injunction. Rectifier has not filed an answer to the Petition nor has Rectifier filed any affidavit which relates to the factual basis for this Court's ancillary jurisdiction or the factual basis for this Court's temporary restraining orders or preliminary injunction.
Neither party requested an evidentiary hearing on the order to show cause re preliminary injunction. Because Rectifier did not file any affidavit concerning the issues of ancillary jurisdiction or the issues of injunctive relief, there are no contested factual issues for this Court to resolve. Thus the Court accepts as true the facts which are stated in the C&R moving papers. Milton Roy Co. v. Bausch & Lomb Inc., 418 F.Supp. 975, 978 (D.Del.1978). To the extent that this Memorandum Opinion has and will address the merits, such discussion is limited to the present issues of ancillary jurisdiction and injunctive relief. See Minn. Ass'n of Health Care Facilities, etc., 602 F.2d 150, 155 (8th Cir. 1979).

II. LEGAL DISCUSSION

A. The Existence of This Court's Ancillary Jurisdiction

C&R urge that jurisdiction of the matter of attorneys' fees may be sustained under the doctrine of federal ancillary jurisdiction. That very issue was considered at length in State of Iowa v. Union Asphalt & Roadoils Inc., 281 F.Supp. 391 (S.D.Iowa 1968), where the District Court said at pp. 396-99:
The applicants urge that jurisdiction of the matter of attorney fees may be sustained by the doctrine of federal ancillary jurisdiction. The ancillary jurisdiction theory is relatively simple โ once federal jurisdiction properly attaches to a primary case, the court also has jurisdiction over certain subsidiary or subordinate disputes even though it might not independently be able to proceed to adjudicate them .... In the situation at hand, the Court's jurisdiction to fix attorney fees is generated by its auxiliary relation to the antitrust action by the State.... The precepts of the ancillary jurisdiction doctrine dictate that the federal courts should extend their jurisdiction to encompass orbital disputes subordinate to the principal action so that complete justice may be done.... Considerations of judicial economy and fairness to all parties underlie the ancillary jurisdiction theory.... And once jurisdiction has attached, it will generally continue until it has been fully exhausted.... It would appear that the sound policies behind the doctrine and its elasticity would command the Court to retain jurisdiction over the auxiliary matter of attorney fees even though it entered a previous Order allowing the counsel to withdraw without such a condition.
. . . . .
However, assuming that the process is irregular, the State has acquiesced in the retention of jurisdiction by this Court over the determination of fees.
. . . . .
Thus, as a matter of law the Court has power to adjudicate the matter of attorney fees for applicants under federal ancillary jurisdiction, by amendment of its Order under Rule 60(b) and under its inherent power to correct orders. [emphasis added]
In State of Iowa v. Union Asphalt & Roadoils, Inc., 409 F.2d 1239 (8th Cir. 1969), the Eighth Circuit affirmed the existence of and the exercise of ancillary jurisdiction by *648 the Iowa District Court concerning the attorney-client fee dispute there involved, stating at pp. 1242-44:
We observe preliminarily that the district court was vested with jurisdiction over the subject matter of the antitrust suit filed on December 6, 1966, out of which this controversy arose. Clayton Act Section 4 (15 U.S.C. ง 15). The question which initially concerned Judge Hanson related to the court's jurisdiction to adjudicate the fee controversy between appellees and their former client. The court engaged in an exhaustive review of the doctrine of federal ancillary jurisdiction, and documented its discussion with authorities which it deemed analogous in principle. 281 F.Supp. at 396. In view of the comprehensive exposition of the law by the district court we shall confine our discussion to the primary purpose of the doctrine of ancillary jurisdiction. 1 Barron and Holtzoff, Federal Practice and Procedure, Section 23 (Rules ed. 1960), often cited by the court, states:
One of the most useful devices for mitigating the otherwise strict limitations of federal jurisdiction is the concept of "ancillary jurisdiction," by which it is held that a district court acquires jurisdiction of a case or controversy as an entirety, and hence may, as an incident to disposition of a matter properly before it, possess jurisdiction to decide other matters raised by the cases of which it could not take cognizance were they independently presented.
If the court has jurisdiction of the principal action, it also has cognizance of any ancillary proceeding therein, regardless of the citizenship of the parties, the amount in controversy or any other factor that would ordinarily determine jurisdiction.

Ancillary jurisdiction exists because without it the court could neither effectively dispose of the principal case nor do complete justice in the premises. It is a common-sense solution of the problems of piecemeal litigation which otherwise would arise by virtue of the limited jurisdiction of federal courts.

Forrester, Federal Jurisdiction and Procedure 294-95 (Dobie and Ladd, 2d ed., 1950) explains the theory and use of ancillary jurisdiction, as follows:
The definitive statements of most legal authorities appear to found the doctrine of ancillary jurisdiction on the basic principles of justice, necessity and efficiency. Ancillary jurisdiction exists because of the relation of the incidental proceeding to the principal case over which original jurisdiction already exists. This relation alone creates and establishes such ancillary jurisdiction.

See also Wright on Federal Courts, ง 9, at 17 (1963); Fins, Federal Jurisdiction and Procedure 71-74 (1960); 21 C.J.S. Courts ง 88 (1940).
There is case law which, in our view lends support for the conclusion that the court had the power to resolve appellees' claim under its ancillary jurisdiction. In National Equipment Rental, Ltd. v. Mercury Typesetting Co., 323 F.2d 784 (2d Cir. 1963), Caddy, the attorney, represented one of the litigants from June 13, 1961, until his discharge on January 29, 1963, during which period an action was brought in the United States district court. After his discharge Caddy filed a motion in the pending district court case seeking the fixing of fees and disbursements due him from his former client. Judge Lumbard observed:
The law seems well settled that a federal district court may condition the substitution of attorneys in litigation pending before it upon the client's either paying the attorney or posting security for the attorney's reasonable fees and disbursements, as these may be determined. [Citing cases] This power resides in the federal court as ancillary to its conduct of the litigation. Id. at 786.
In a footnote Judge Lumbard stated:
The termination of relations between a party in litigation in a federal court and his attorney is a matter relating to the protection of the court's own officers *649 and is not subject to the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Id.

See also First Iowa Hydro Elec. Coop. v. Iowa-Illinois Gas & Elec. Co., supra [245 F.2d 613 (8th Cir.)].
Here, of course, the order of January 10, 1967, permitting appellees to withdraw was not conditioned upon the state of Iowa paying the attorneys or posting security. We do not believe the failure to enter a conditional order deprived the court of authority to entertain a subsequent motion by appellees and to grant such relief as was required to do full and complete justice. In our view, the order, interlocutory in nature as it was, did not have the legal effect of destroying jurisdiction which existed by force of law.
We are satisfied that on this record power resided in the district court to adjudicate the disagreement between appellees and the attorney general of Iowa as ancillary to its jurisdiction over the principal action. As Judge Hanson's opinion discloses, he also concluded that he had the authority under Rule 60(b), F.R.Civ.P., or under his inherent power to grant appellees relief. In view of our holding we find it unnecessary to consider or discuss these alternative theories. [emphasis added]
The majority view, generated by the State of Iowa cases, supra, is that ancillary jurisdiction over attorney-client fee disputes is inherent and exists in the District Courts independent of jurisdiction conferred by statute, or statutory venue requirements or federal rules of procedure. In Re Hoy's Claim, 93 F.Supp. 265-66 (D.Mass.1950); Moore Bros. Const. Co. v. City of St. Louis, 159 F.2d 586 (7th Cir. 1947); American Federation of Tobacco Growers Inc. v. Allen, 186 F.2d 590 (4th Cir. 1950); Grimes v. Chrysler Motors Corp., 565 F.2d 841 (2d Cir. 1977); Murphy v. Kodz, 351 F.2d 163 (9th Cir. 1965); Clark v. United States, 379 F.Supp. 1399 (N.D.Iowa 1974); National Equipment Rental Ltd. v. Mercury Typesetting Co., 323 F.2d 784 (2d Cir. 1963); City of Hankinson, North Dakota v. Otter Tail Power Co., 294 F.Supp. 249 (D.N.D.1969); John Griffiths & Son Co. v. United States, 72 F.2d 466 (7th Cir. 1934). Ice Projects Inc. v. World Hockey Ass'n, 443 F.Supp. 483, 487 (E.D.Pa.1977).
As the Court said in State of Iowa, at 281 F.Supp. 396:
The ancillary jurisdiction theory is relatively simple โ once federal jurisdiction properly attaches to a primary case, the court also has jurisdiction over certain subsidiary and subordinate disputes even though it might not independently be able to proceed to adjudicate them.
In the attorney-client fee dispute presented by the C&R Petition, it cannot be disputed that this Court had subject matter jurisdiction over the main action which was an antitrust case brought by Rectifier and its subsidiary corporations under the federal antitrust laws against American Cyanamid Company, Pfizer Inc., Bristol-Myers Company, E.R. Squibb & Sons, Inc., and the Upjohn Company ("under and pursuant to Sections 4, 12 and 16 of the Clayton Act (U.S.C. Sections 15, 22 and 26) to secure ... relief [under] Sections 1 and 2 of the Sherman Act (15 U.S.C. Sections 1 and 2) and Section 3 of the Clayton Act (15 U.S.C. Section 14).") Where the Court has subject matter jurisdiction over the main action, its ancillary jurisdiction is inherent and considerations of removal jurisdiction, diversity, pendent jurisdiction and venue are inherent. Travis v. Anthes Imperial Limited, 473 F.2d 515, 528-29 (8th Cir. 1973):
At the outset, we note that for practical purposes, our decision with respect to subject matter jurisdiction also decides the question of venue.
Accord, Continental Grain etc. v. Oil Seeds Inc., 592 F.2d 409, 422 (8th Cir. 1979).
Rectifier argues that ancillary jurisdiction expired when the main action was settled and dismissed with prejudice and that ancillary jurisdiction does not exist six years after that event. Rectifier emphasizes the dismissal was with prejudice and without attorneys' fees or costs. Such dismissals cannot oust the Court of ancillary jurisdiction and has no bearing on whether *650 the Court has ancillary jurisdiction. Schmidt v. Zazzara, 544 F.2d 412, 414 (9th Cir. 1976):
Zazzara first argues that the district court erred in retaining jurisdiction over the question of attorney's fees after the consent judgment had been entered. We do not agree. Allowance of attorney's fees "is part of the historic equity jurisdiction of the federal courts." Sprague v. Ticonic Bank, 1939, 307 U.S. 161, 164, 59 S.Ct. [777], 779, 83 L.Ed. 1184, and the district court could properly retain jurisdiction to determine appropriate attorney's fees ancillary to the case .... It was "not necessary to relegate Plaintiff to a separate action to recover fees." ...
Likewise, Zazzara claims that the award was beyond the district court's jurisdiction because of the clause in the consent judgment requiring "each party to bear its own costs and attorneys fees" is without merit.
Ancillary jurisdiction does not depend on the pendency of the main action, but exists both during and after the main action for the same policy reasons which determine whether the court should exercise that jurisdiction and entertain the Petition. Sprague v. Ticonic Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); State of Iowa v. Union Asphalt & Roadoils Inc., 281 F.Supp. 391 (S.D.Iowa 1968), aff'd 409 F.2d 1239 (8th Cir. 1969); American Federation of Tobacco Growers Inc. v. Allen, 186 F.2d 590 (4th Cir. 1951); John Griffiths & Son Co. v. United States, 72 F.2d 466 (7th Cir. 1934); In Re Hoy's Claim, 93 F.Supp. 265 (D.Mass.1950).
It would be anomalous if federal ancillary jurisdiction existed to protect the plaintiff's attorney who was discharged during the pendency of the main action but did not exist to protect the plaintiff's attorney who successfully settled and dismissed the main action for the plaintiff in the main action and thereafter became involved in a fee dispute with that plaintiff. Such is not the law. Ancillary jurisdiction was exercised after the main action concluded in Schmidt v. Zazzara, supra; In Re Hoy's Claim, supra; and Moore Bros. Const. Co. v. City of St. Louis, 159 F.2d 586 (7th Cir. 1974). If ancillary jurisdiction exists, the District Court need not resort to the procedural device of amending the judgment in the main action or vacating and reinstating that judgment. State of Iowa v. Union Asphalt & Roadoils Inc., supra. Ancillary jurisdiction is not dependent on procedural devices afforded by the Federal Rules of Civil Procedure. Ibid.
Attorney-client fee disputes within the Court's ancillary jurisdiction are best determined after the main action is concluded in order not to interfere with or delay the prosecution of the main action. Moore v. Telfon Communications Corp., 589 F.2d 959 (9th Cir. 1978). Ancillary jurisdiction exists not only to fix the attorneys' fee but also to resolve any attorney-client contractual fee dispute. City of Hankinson, North Dakota v. Otter Tail Power Co., 294 F.Supp. 249 (D.N.D.1969); John Griffiths & Son Co. v. United States, 72 F.2d 466 (7th Cir. 1934); Farmington Dowel Products v. Forster Mfg. Co., 421 F.2d 61 (1st Cir. 1969). In the present case, C&R seek release of their escrowed funds on the ground that the paragraph 4 indemnity has been exonerated by subsequent events. Alternatively C&R allege that Rectifier has repudiated the May 16, 1974, fee agreement which entitles them to elect quantum meruit. C&R also plead additional alternative counts for rescission and fraud. This Court should not resolve those issues on the merits at this preliminary stage of the proceedings. Chicago Great Western Ry. Co. v. Chicago, B&Q R. Co., 193 F.2d 975 (8th Cir. 1952):
The other contentions urged on behalf of defendant go to the merits of the controversy between the parties. These issues are substantial and cannot properly be determined in advance of the trial of the case on its merits.... [C]ounsel for defendant has briefed and argued the issues as if they had been determined on the merits and insist that we determine them on this appeal. This we must decline to do. The application here was *651 addressed to the judicial discretion of the court.... Orderly procedure in the circumstances here disclosed required that the parties try this case on its merits before attempting to present to this court the issues going to the merits of the action.
Id. at 978.
Rectifier also argues that the side letter of August 12, 1975, evidences the intent of both Rectifier and C&R to waive ancillary jurisdiction over future attorney-client fee disputes. C&R assert by verified Petition and by affidavit that the side letter was intended to "reserve and preserve" ancillary jurisdiction over future attorney-client fee disputes while at the same time terminate ancillary jurisdiction to the extent that the exercise thereof would involve any of the antitrust defendants or affect the finality of the settlement and dismissal of the main action. Both parties agree that Rectifier and the antitrust defendants could not confer subject matter jurisdiction or ancillary jurisdiction upon the court. See State of Iowa v. Union Asphalt and Roadoils, Inc., supra. Similarly, the parties could not limit the Court's jurisdiction or deprive the Court of existing jurisdiction. Thus the parties' intent in attempting to preserve or waive the Court's ancillary jurisdiction is addressed to the Court's discretionary exercise of that jurisdiction rather than to the existence of jurisdiction itself. Consequently, the side letter will be considered in discussing the factors which militate in favor of and against the exercise of ancillary jurisdiction. However, before considering that question of the discretionary exercise of jurisdiction, the Court notes that Rectifier argues that:
The letter clearly states that the settlement agreement and stipulation to dismiss the main action were not "intended to affect one way or another whether" this Court is to have continuing jurisdiction to resolve attorney's fee claims against Rectifier.
Rectifier thus concedes that the issue is not inherent jurisdiction, but rather the discretionary exercise thereof.
Rectifier cites Bounougias v. Peters, 369 F.2d 247, 249 (7th Cir. 1966); Minersville Coal Co. Inc. v. Anthracite Export Ass'n, 55 F.R.D. 429 (M.D.Pa.1972) and Adams v. Allied Chemical Corp., 503 F.Supp. 253 (E.D. Va.1980); for the proposition that this Court does not have ancillary jurisdiction. Bounougias, Minersville, and Adams represent the minority view that an attorney-client dispute is ipso facto collateral and independent of the main action and therefore has no "direct connection" to the main action upon which to predicate ancillary jurisdiction. Bounougias and its progeny rely on the absence of a "direct relation" for ancillary jurisdiction, quoting Fulton National Bank of Atlanta v. Hozier, 267 U.S. 276, 45 S.Ct. 261, 69 L.Ed. 609 (1925), and conclude that all attorney-client fee disputes do not have that "direct relation."
The majority view espoused by State of Iowa, supra, (and the cases following State of Iowa, supra) hold that the "direct relation" does exist for attorney-client disputes. In Grimes v. Chrysler Motors Corp., 565 F.2d 841 (2d Cir. 1977), the Second Circuit also cited Fulton National Bank of Atlanta v. Hozier in support of the majority view stating:
Although the exact jurisdictional question involved in this suit rarely arises there is ample authority to support the general proposition that:
A district court acquires jurisdiction of a case or controversy as an entirety, and may, as an incident to the disposition of a matter properly before it, possess jurisdiction to decide other matters raised by the case of which it could not take cognizance were they independently presented.
... The Supreme Court has established that the exercise of ancillary jurisdiction is appropriate where the subsidiary controversy "has direct relation to property or assets actually or constructively drawn into the court's possession or control by the principal suit." Fulton National Bank of Atlanta v. Hozier ... Under these standards, the District Court's distribution of the Grimes *652 settlement funds and its determination of appropriate disbursements was clearly ancillary...."
Cases such as Fulton, supra, and United Mineworkers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1936) (cited by Rectifier), were concerned with the scope of pendent jurisdiction, not ancillary jurisdiction, and are analogous only insofar as the policy considerations of judicial economy and convenience and economy to the parties is common, but are not otherwise applicable because the other pendent jurisdiction considerations are different from the reasons for the existence of and the exercise of ancillary jurisdiction. For pendent jurisdiction a "direct connection" exists if the state claims are involved in the federal claims and must, will, or should be decided in one court and without burdening the federal court with side issues. Ancillary jurisdiction, however, is based upon the strong federal policy reasons discussed below.
This Court must follow the majority rule established by the Eighth Circuit in State of Iowa, supra, which is the majority view and the better rule of law.
Neither Bounougias, supra, nor any of its offspring involved a situation where the main case was a federal antitrust case and the policy of Section 4 of the Clayton Act or the federal policy of inherent equity jurisdiction to protect attorneys' rights to fees under Sprague v. Ticonic Bank, supra, was brought to bear to support the discretionary exercise of ancillary jurisdiction.
This Court determines that it does have ancillary jurisdiction and will now consider the discretionary exercise of that jurisdiction.

B. The Considerations Controlling This Court's Exercise of Ancillary Jurisdiction

Ancillary jurisdiction should be entertained if the following policy considerations tip the balance in the petitioner's favor: (1) effectuating the private attorney general policy of Section 4 of the Clayton Act; (2) assuring the just, expeditious and economical resolution of attorney-client fee disputes; and (3) protecting the attorneys who are officers of the Court from expensive and protracted state court proceedings.

(1) To effectuate the private attorney-general policy of Section 4 of the Clayton Act.
If the main action is a federal antitrust case, policy favors effectuating the private attorney-general policy of Section 4 of the Clayton Act by awarding the plaintiff's attorneys the agreed fee or a reasonable fee, if the plaintiff's attorney is entitled thereto, without the delay and expense occasioned by a state court action.[1]
The policy of Section 4 requires that the antitrust defendants pay the successful plaintiff's attorneys a reasonable fee in order to encourage attorneys to act as private attorneys-general in enforcing the antitrust laws. The reasonableness of that fee, whether contractual between the parties, or fixed by the Court, or in combination, is within the subject matter jurisdiction of the Court that tried the main antitrust case. Farmington Dowel Products Co. v. Forster Mfg. Co., 421 F.2d 61, 86-92 (1st Cir. 1969); In Re Uranium Antitrust Litigation, 617 F.2d 1248, 1261 (7th Cir. 1980); Perma Life Mufflers v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). That same policy requires that the Court exercise its ancillary jurisdiction over an attorney-client fee dispute where the Court can resolve the fee dispute more expeditiously and economically than would be the case if the parties were relegated to a state court action. American Federation of Tobacco Growers, Inc. v. Allen, supra:
Plaintiff may not include such fees in the settlement and then ignore the rights *653 of counsel therein. It is argued that the controversy over fees is one which the parties should settle in the state courts as there is no diversity of citizenship; but the controversy is ancillary to the handling of a case in the federal court, the attorney who alleges that he has been mistreated is an officer of the court ... and the controversy relates to funds received by a party in settlement of the case....
As noted above, the $33 million paid to Rectifier by the antitrust defendants included an unspecified amount for attorneys' fees.
Nor is it disputed that if C&R or Rectifier brought this suit in the California trial court it would take almost five years to come to trial because of the congested trial calendar in that Court. This Court can act with the far greater expedition that Section 4 requires, and for which ancillary jurisdiction exists. Attorneys who act as private attorneys-general in enforcing the federal antitrust laws would hardly be encouraged to do so in the future if the client repudiates the fee agreement at or after the main case ends and the attorney is faced with years of expense in a state court to collect his fee. The antitrust plaintiff who prays in the federal court for attorneys' fees and, recovering an amount which includes attorneys' fees, cannot justly expect that, upon refusing to pay his attorneys, he can avoid the jurisdiction of the federal court and litigate that issue at his leisure in the state court.
In Farmington Dowel, the Court said (at p. 89) that:
... Section 4 contemplates an estimate of reasonableness [of the attorney's fee] of one looking back over the litigation.
This Court has expended six years of judicial time in supervising all of the discovery in the main action and the related actions and in trying the main action for eight months. This Court should effectuate the policy of Section 4 of the Clayton Act by now finishing its work and resolving the fee dispute between C&R and Rectifier.

(2) To assure the just, expeditious, and economical resolution of attorney-client fee disputes.
Case law dictates that courts utilize ancillary jurisdiction as an expeditious and economical method in resolving attorney-client fee disputes. State of Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391, 396 (D.Iowa 1968), ("... so that complete justice may be done ... considerations of judicial economy and fairness to all parties underlie the ancillary jurisdiction theory.") Andrews v. Central Surety Insurance Co., 295 F.Supp. 1223, 1230 (D.S.C.1969), ("It would be a useless waste of judicial time and costs for this court not to accept its responsibility and determine the issues herein presented."); Grimes v. Chrysler Motors Corp., 565 F.2d 841, 843 (2d Cir. 1977), ("considerations of judicial economy, convenience and fairness to litigants will be furthered thereby.")
In this case, there is no doubt that judicial economy, fairness to both parties and economy for both parties will be promoted by this court's acceptance of ancillary jurisdiction. Rectifier's announced intent to "... keep you [C&R] tied up in court for at least five years" is an objective that the policy underlying ancillary jurisdiction and Section 4 of the Clayton Act must preclude.
It is not disputed that the instant attorneys' fee dispute between C&R and Rectifier is not presently involved in either the RM&S case or in the doxycycline case. Rectifier's memorandum admits that "... the California state court has not assumed jurisdiction over the [escrowed] funds in the pending RM&S action ...."
Thus it is conceded that this Court's exercise of ancillary jurisdiction does not interfere with the jurisdiction of any court in any pending case.
Rectifier's threatened Chapter 11 bankruptcy proceeding appears to be dependent on a future damages award in the doxycycline case. (It is not, however, clear whether Rectifier will await that event or would have filed a Chapter 11 proceeding to involve the escrowed funds if this Court's *654 temporary restraining order had not issued.) If Rectifier ultimately files that proceeding, the substantive issues will be the same as those presented by the petition โ namely, must Rectifier release C&R's escrowed funds because no indemnity event has occurred or can occur in the future. C&R are entitled to a speedy adjudication of that issue and should not be forced to await the outcome of the RM&S case, or the doxycycline case or a future Rectifier bankruptcy proceeding. If C&R's indemnity is exonerated and if C&R did not indemnify Rectifier against an adverse monetary judgment in the doxycycline case, then C&R are entitled to the release of their escrowed funds, and were so entitled in November 1980, when only Rectifier appealed from the RM&S judgment. Rectifier is not entitled to delay the determination of that issue by arguing that this Court's jurisdiction interferes with the California court's, which it does not, or by asserting that its position on the merits is correct, which is irrelevant to this Court's jurisdiction, or that Rectifier has a right to delay in order to involve C&R's escrowed funds in a contemplated future Chapter 11 proceeding. If Rectifier files for a Chapter 11 bankruptcy reorganization, the preliminary issue raised thereby will be whether the escrowed funds are the property of Rectifier or the property of C&R. A speedy resolution of the merits in this Court will also resolve that issue under the principles of res adjudicata.
This Court's exercise of its inherent ancillary jurisdiction also does not interfere with the pending RM&S case which is now on appeal. That appeal does not involve any of the issues raised by the Petition. The judgments of the California trial court, while on appeal, are presumed to be correct. Argabrite v. Argabrite, 56 Cal.App. 650, 652, 206 P. 81 (1922); Jenner v. Murphy, 6 Cal.App. 434, 437, 92 P. 405 (1907). If those trial court judgments are reversed and the issues herein are made issues therein by amendment to the pleadings before a retrial, this Court can frame its decision herein to protect any RM&S right which may appear. In the intervening period of time, this Court may have already resolved the issue of whether C&R or Rectifier are entitled to the escrowed funds.
Resolution of that issue will advance the interests of RM&S, Rectifier and C&R in the RM&S case. If RM&S ultimately prevails against Rectifier only, it cannot reach the escrowed funds until the issue herein is determined except by asserting prior lien rights. RM&S cannot execute upon a judgment against Rectifier upon funds which are the property of C&R. In the interim, RM&S may intervene in this case to protect any lien right it may ultimately be able to assert concerning the escrowed funds. Andrews v. Central Surety Insurance Co., 295 F.Supp. 1223, 1230 (D.S.C.1969); City of Hankinson, North Dakota v. Otter Tail Power Co., supra; Ice Products Inc. v. World Hockey Ass'n, supra.
Indeed, the respective lien rights of RM&S and C&R appear to be controlled by federal and not state law, Sprague v. Ticonic National Bank, supra, and should be decided in this Court in order to supplement the policy considerations of Section 4 of the Clayton Act. The policy considerations of Section 4 of the Clayton Act would afford scant protection for the attorney for the successful plaintiffs without also protecting that fee from liens or claims of others under the equitable priority thereto afforded by Sprague v. Ticonic Bank, supra.
Based on the present status of the RM&S case, any RM&S lien claims would be based on its prior representation of Rectifier in the main action until May 14, 1974, whereas C&R appears to have a superior lien under Sprague v. Ticonic Bank, supra, for their services between May 16, 1974, and August 14, 1975, which resulted in the $33 million settlement and the C&R 8พ% C&R escrowed bonus fee.
Thus, this Court's adjudication of the issues raised by the Petition will necessarily resolve all of those potential issues before they become actual issues, if they do, *655 in any pending or possible future action or proceeding. Consequently, this Court's exercise of its ancillary jurisdiction will prevent the potential multiplicity of actions which is threatened by a present or future RM&S lien claim or a future Rectifier Chapter 11 proceeding before they become issues in those threatened actions and proceedings. It is the very delay inherent in a California state court action between C&R and Rectifier which is likely to cause that multiplicity of actions. Such considerations are valid and important in deciding whether or not to exercise ancillary jurisdiction. Indeed they are so valid and important that those reasons, in and of themselves, can give rise to a whole different jurisdiction, pendent jurisdiction.
Rectifier argues that the interpretation of the May 16, 1974, C&R-Rectifier fee agreement is controlled by California law and that the California courts should apply that law. That argument is not compelling. Federal courts have consistently held that if there is jurisdiction over the main action there is ancillary jurisdiction over an attorney-client contractual fee dispute arising out of the main action irrespective of whether only state law controls that fee agreement. State of Iowa v. Union Asphalt & Roadoils Inc., supra; Chicago Great Western Ry. Co. v. Chicago B&Q R. Co., supra; Grimes v. Chrysler Motor Corp., supra; Murphy v. Kodz, 351 F.2d 163 (9th Cir. 1965).
Moreover, state law does not control these aspects of the Rectifier-C&R fee dispute:
a) if C&R are entitled to elect quantum meruit, federal substantive law controls the amount of that entitlement, and
b) if RM&S decides to intervene to assert any claimed state lien right to the escrowed funds, federal law appears to control priority of lien rights under what has been referred to as the Equitable Fund doctrine. Sprague v. Ticonic Bank, supra; In Re Hoy's Claim, supra.

(3) To protect the attorneys who are officers of the court from expensive and protracted state court proceedings.
In City of Hankinson, North Dakota v. Otter Tail Power Co., supra, the Court said:
The termination of relations between a party in litigation and his attorney is a matter relating to the protection of the Court's own officers.
Accord, State of Iowa v. Union Asphalt & Roadoils, Inc., supra; National Equipment Rental Ltd. v. Mercury Typesetting Co., supra; American Federation of Tobacco Growers, Inc. v. Allen, supra.
As noted above, Rectifier asserts that the side letter from the antitrust defendants, setting forth their understanding that the settlement and dismissal with prejudice was not intended to affect "one way or another" future jurisdiction of this Court over an attorney-client fee dispute, was intended to abandon jurisdiction concerning such a dispute or waive jurisdiction. C&R asserts that by the side letter Rectifier and C&R intended to reserve ancillary jurisdiction for all future fee disputes without involving the antitrust defendants if possible.
The side letter is careful to state that it is "the understanding of Defendants that the dismissal of the main action shall not affect `one way or the other' the ancillary jurisdiction of this Court over future fee disputes between Rectifier and its former attorneys (RM&S) or then attorneys (C&R)." The understanding of Rectifier and its then attorneys, C&R, is left unstated. It appears from Cohen's affidavit, and without challenge from Rectifier, that the parties to the main action intended to end jurisdiction over the antitrust defendants and preserve jurisdiction over future disputes between Rectifier and its attorneys to the extent that they could do so. The parties to the main action were represented by competent counsel who are presumed to know the law, and to therefore also know that if they did not affect this Court's ancillary jurisdiction "one way or another" that jurisdiction would continue to exist. The fact that the antitrust defendants obtained an indemnity and a defense from Rectifier in the event *656 this Court's ancillary jurisdiction was invoked supports C&R's position that all parties were well aware that the Court had and would continue to have ancillary jurisdiction over any later attorney-client fee dispute. The Court therefore accepts C&R's position that jurisdiction over this dispute was not intended to be abandoned but rather intended to be preserved. Thus the Court concludes that C&R cannot, in effect, be estopped from asking this Court to exercise its jurisdiction.
Rectifier next asserts that by failing to employ a procedural method to bring the RM&S case before this Court C&R are also estopped from bringing the C&R-Rectifier dispute before this Court. The RM&S case did not involve any dispute between Rectifier and C&R concerning the ownership of the escrowed funds or the scope of the C&R indemnity. To the contrary, the trial court result in that case, according to C&R and Rectifier, is a condition precedent to Rectifier's obligation to release C&R's escrowed funds. The instant dispute did not arise until after the California trial court judgment against Rectifier and the time period for a direct appeal expired. In fact the dispute did not actually arise until February 22, 1981, when Rectifier rejected C&R's demand that the escrowed funds be released. Whether the Court should have accepted the issues raised in the RM&S case under its discretionary ancillary jurisdiction, had C&R petitioned therefor, was raised by Rectifier orally at the June 17, 1981, hearing and has not been briefed by either party. The Court deems the issue to be, in any event, a false issue because the RM&S case did not involve any issue between C&R and Rectifier who were both defendants therein. Thus, any analysis of whether C&R could have invoked this Court's ancillary jurisdiction is a useless exercise. Absent any express agreement between C&R and Rectifier to litigate their existing fee disputes in the California courts, this Court should exercise its discretion in favor of protecting its officers from dilatory and multiplicitous litigation.
The real issue as to whether this Court should exercise its discretion is whether Rectifier can show any prejudice by reason of the RM&S case, or by reason of the passage of time since the August 1975 settlement and dismissal, or by reason of anything else. Rectifier has not addressed this issue.
Thus the Court must conclude that Rectifier and C&R intended to preserve this Court's ancillary jurisdiction for the very dispute involved herein, that Rectifier can show no prejudice if this Court exercises that jurisdiction, and that therefore this Court should not relegate C&R to the dilatory and multiplicitous and costly litigation which appears to be inevitable if the Court refuses to exercise its discretion.
Every factor discussed above virtually compels this Court to exercise its jurisdiction. C&R were an essential part of the coordinated and consolidated pretrial proceedings and the consolidated trial before this Court which resulted in the settlement of five of six of those consolidated cases. As this Court said in enjoining Pfizer Inc. from further proceeding before the Tariff Commission in Pfizer Inc. v. International Rectifier Corp., No. 4-73 Civil 188, CCH 1975 Trade Cases 66,074 (D.Minn.1975):
Rectifier's principal counsel are two lawyers who are fully engaged in the trial of the antibiotic antitrust action before the Court. They have been involved in the antibiotic antitrust action since 1969 and are taking an active role in the case. Any division of their energies to duplicative proceeding in the Trade Commission would adversely affect the progress of this trial and the interests of the many other participants therein. [emphasis added]
This Court was there referring to Cohen and E. Riordan, whose efforts contributed to the settlement of all of the cases which were pending in this Court, and this Court should therefore exercise its discretion to protect C&R, as officers of this Court, by speedily resolving their fee dispute.

*657 C. 28 U.S.C. ง 1404(a) Transfer.

(1) Analogy to ancillary jurisdiction
The reasons for exercising ancillary jurisdiction are analogous to the reasons supporting a 28 U.S.C. ง 1404(a) transfer.[2]
On September 8, 1971, this Court issued an order to show cause why the main action should not be transferred to the District of Minnesota for trial. In September of 1971, both Rectifier and the PNSC filed briefs supporting the transfer. In December 1973 and January 1974, Rectifier and the anti-trust defendants again briefed that issue. At that time, the United States government case, the Mutual of Omaha class action case and the Union Health and Welfare class action case were set for trial before this Court. Throughout the period from September 1971 to January 1974, and thereafter, Rectifier sought a ง 1404(a) transfer to this Court for trial asserting that "Judicial efficiency will be best served by Transfer," "... it will obviously save judicial time if the same judge who conducted the pretrial proceedings and is therefore already familiar with the case also tries the case," "Moreover, a transfer and consolidation of the International Rectifier case will also serve the overall convenience of the parties and the witnesses," "a handful of the witnesses whom the International Rectifier Plaintiffs intend to call reside in California," "... that none of [the antitrust Defendants'] arguments, either legal or factual, presents any valid argument ... for delaying the trial of the International Rectifier case," "... that what [the antitrust Defendants] have in mind is to transfer the International Rectifier case to California in the hope that before a judge who is not familiar with the case ... they can delay the case indefinitely," and "transfer and consolidation ... will serve not only the interests of judicial economy and the convenience of the International Rectifier Plaintiffs and all of the witnesses, but also will serve all of the legitimate interests of [the antitrust defendants]."[3]
This Court finally granted Rectifier's ง 1404(a) motion on July 11, 1974, in the interests of justice and for the convenience of the parties and the witnesses.
Rectifier, of course, made the same arguments of judicial economy, convenience of the parties and its witnesses in successfully resisting the antitrust defendants' motion before the Multidistrict Panel to remand the main action to the District of California in 1971 and in successfully transferring the four related actions to this Court for coordinated and consolidated pretrial proceedings in 1971, 1972, 1973, and 1974. See, e. g., In Re Antibiotic Drug Antitrust Litigation (Pfizer Inc. v. International Rectifier Corp. et al.) 177 U.S.P.Q. 649 (JPML 1973).
The same considerations of judicial economy and the convenience of the parties and the witnesses coupled with the other policy considerations for exercising ancillary jurisdiction have convinced this Court to exercise its discretion in favor of accepting jurisdiction of the attorney-client fee dispute raised by the Petition. Pfizer Inc. v. Lord, 447 F.2d 122 (2d Cir. 1971).

(2) Rectifier's current 28 U.S.C. ง 1404(a) motion
On June 17, 1981, Rectifier filed "Respondents List of Possible Witnesses" in support of its pending ง 1404(a) motion. "C&R's Present List of Expected Trial Witnesses Etc.," filed June 18, 1981, states, as does Cohen's affidavit, that the only witnesses on the liability issues raised by the Petition are Mr. Cohen and Mr. Koris, Rectifier's Vice President, Secretary, general counsel and chief legal officer.
*658 Rectifier's list of possible witnesses does not explain how any of the other listed Rectifier witnesses have or could have any knowledge concerning the liability issues raised by the Petition. Nor does Rectifier's list of possible witnesses dispute C&R's assertion that the only witnesses on the liability issues are Mr. Cohen and Mr. Koris. To the contrary, it appears that Rectifier's "possible" witnesses' testimony concerns primarily the Court's discretionary exercise of its ancillary jurisdiction or the Court's temporary restraining orders and preliminary injunction. For example, Rectifier's list does not explain how any members of the RM&S firm can have any knowledge concerning the scope of the C&R indemnity set forth in paragraph 4 of the C&R-Rectifier fee agreement. Similarly, Rectifier's list states for its seventh (and last) witness that "Stuart L. Kadison, attorney for RMS firm" can testify concerning "facts re RMS case and RMS firm's claims to escrowed funds." The only relevance of the RM&S case to the liability issues raised in this Court appears to be the RM&S judgment and the appeals therefrom which are a matter of record rather than witnesses' testimony. Similarly the RM&S firm's claims to the escrowed funds appear to have only two bases: first, its asserted contractual lien on the escrowed funds which is discussed above; second, its dismissed count for alleged wrongful dissolution by C&R of RM&S claiming damages entitlement to the escrowed funds โ from which dismissal RM&S's appeal is pending in the California appellate court. As stated heretofore, the California trial court judgments are presumed to be correct, and will in any event be decided by the California courts. Even if this Court were to speculate that RM&S's appeal against C&R would be successful and that RM&S would establish its claim to those funds as compensable damages, RM&S could still not reach those funds until a court decides whether the escrowed funds belong to C&R or to Rectifier. That is the issue in this case and is not an issue in the RM&S case or any other pending case. As also stated above, RM&S can intervene herein to protect any interest it may have.
The Court must therefore accept C&R's verified assertion that the only liability witnesses are Mr. Cohen and Mr. Koris. Rectifier's unverified and generalized list of possible witnesses does not contradict that assertion. Moreover, C&R's list of witnesses shows that if this Court reaches the quantum meruit damage issue, five of C&R's expert witnesses on that issue reside in Minnesota, and the remaining four reside in San Francisco, California, Sewickley, Pennsylvania, Topeka, Kansas, and Washington, D. C. Although the Court may not reach that issue, see Newburger Loeb & Co., Inc. v. Gross, 563 F.2d 1057, 1067 (2d Cir. 1977), it cannot make that determination at this time. In addition, Rectifier is free to renew its ง 1404(a) motion in the future.
The ง 1404(a) considerations support this Court's exercise of ancillary jurisdiction and those same factors require the Court to deny Rectifier's ง 1404(a) motion to transfer the case to the California Federal District Court. In addition, the California Federal District Court does not have ancillary jurisdiction because it did not handle any of the pretrial proceedings or the trial. Nor does the California District Court have removal jurisdiction, pendent jurisdiction or federal subject matter jurisdiction. Andrews v. Central Surety Insurance Company, supra; Grimes v. Chrysler Motor Corp., supra. Consequently, if this Court were to grant Rectifier's ง 1404(a) motion to transfer, the California Federal District Court would have to dismiss the Petition for lack of jurisdiction and C&R would be relegated to the California State Court. That result would be the same as this Court refusing to accept ancillary jurisdiction. For this reason also the Court denies Rectifier's ง 1404(a) motion.

D. The Temporary Restraining Orders and the Preliminary Injunction.

Upon filing their petition, C&R applied for and this Court issued a temporary restraining order on May 28, 1981. By stipulation and Order dated June 4, 1981, this Court suspended that Order pending settlement negotiations by the parties. The parties' *659 settlement efforts began on June 10, 1981, and failed on that date. On June 12, 1981, C&R applied for reinstatement of the temporary restraining order and after hearing both parties the Court reissued that Order.
The temporary restraining orders directed Rectifier to instruct the California Bank to transfer the escrowed funds to the Minnesota Bank. The funds were to remain in the Minnesota Bank pending final adjudication in this Court or until further Order of this Court. The temporary restraining orders further restrained Rectifier from interfering with the Minnesota Bank's possession or administration of those funds. The Orders included as Exhibit A a form letter for Rectifier to sign and deliver to the California Bank directing the transfer of the escrowed funds. The Minnesota Bank had agreed to administer those funds according to the very same terms contained in the Escrow Instructions between the parties and the California Bank, and the Court's Orders required the Minnesota Bank to do so.
Process was served on Rectifier on May 31, 1981. On June 3, 1981, Rectifier instructed the California Bank to "... examine the mechanics of this type of transfer so that we may be in a position to promptly comply with the Order."[4] The California Bank advised Rectifier that its said instructions did not provide authorization for the bank to transfer the funds and that more explicit instructions were required. Rectifier advised the California Bank that it would contact the Bank later in that regard.
After the June 12, 1981, hearing reinstated the temporary restraining order, Rectifier appealed to the Eighth Circuit. That appeal was dismissed, without prejudice, on June 15, 1981.
On June 15, 1981, Rectifier instructed the California Bank to transfer the escrowed funds, by simply signing and delivering the Exhibit A form letter to the California Bank. The escrowed funds were then transferred to the Minnesota Bank by federal wire and book entry and by endorsement and delivery of certificates, and that transfer was completed without cost or expense to the parties, prior to the June 17, 1981, hearing on the order to show cause re preliminary injunction.
On June 17, 1981, this Court issued a preliminary injunction ordering the Minnesota Bank to hold, maintain and pay out the escrowed funds as provided in the escrow instructions and again restrained Rectifier from interfering with the bank's possession or administration of those funds.
Rectifier admits that C&R are entitled to all of the income and earnings derived from the escrowed funds under the terms of the May 16, 1974, C&R-Rectifier fee agreement and the Escrow Instructions until the issues raised by the Petition are finally adjudicated. In its appeal to the Eighth Circuit, Rectifier stated that "... under the present escrow arrangement the plaintiffs [C&R] have been and will continue to receive the interest paid on said funds."
Rectifier has not filed any affidavits relating to the injunction issues, but, by memoranda of law and argument of counsel, asserted that preliminary injunctive relief is inappropriate and improper.
In particular, Rectifier has not offered any explanation as to why the maintenance of the escrowed funds in the California Bank is of any significance or importance to Rectifier.
This Court issued the temporary and preliminary injunctions to preserve the status quo during the pendency of this case based upon the verified Petition and the affidavits filed by C&R and which Rectifier has not controverted. The status quo in this case is not, as Rectifier asserts, the situs of the escrowed funds. The status quo is that the funds remain in escrow and that C&R continue to receive the income and interest therefrom during the pendency of this case. The Court's temporary and preliminary injunctions *660 have assured that status quo pending the outcome of this case.
The Cohen affidavit dated May 28, 1981, states that "transfer of the escrowed funds to a Minneapolis, Minnesota Bank, as requested herein, cannot conceivably harm Rectifier in any way since the escrowed funds will remain on deposit until the final conclusion of the Petition and will be subject to the very same terms and provisions which Rectifier initially agreed to." Rectifier has not denied that assertion. To the contrary, both at the hearing on June 12, 1981, and at the hearing on June 17, 1981, Rectifier's counsel conceded that neither Rectifier nor any of its creditors nor any alleged claimant to the escrowed funds would possibly suffer any conceivable harm if the escrowed funds remain on deposit in the Minnesota Bank pending final adjudication in this Court.
As an adjunct of this Court's ancillary jurisdiction, we have the power to order the parties to the main action to deposit the settlement funds into the court's registry pending adjudication of the ancillary attorneys' fee dispute. Grimes v. Chrysler Motors Corp., supra; Andrews v. Central Surety Insurance Co., supra. The injunctions issued by this Court were simply in aid of its powers. In Re Uranium Antitrust Litigation, 617 F.2d 1248, 1261 (7th Cir. 1980).
... The Supreme Court has established that the exercise of ancillary jurisdiction is appropriate where the subsidiary controversy "has direct relation to property or assets actually or constructively drawn into the court's possession or control by the principal suit...." Fulton National Bank of Atlanta v. Hozier, 267 U.S. 276 [45 S.Ct. 261, 69 L.Ed. 609] ... (1925). Under these standards the District Court's [action] was clearly ancillary to its approval of the settlement in the case. [Citing State of Iowa.] [emphasis added]
Where the Court has ancillary jurisdiction in an attorney-client fee dispute, it also has constructive possession of the settlement funds wherever located and even if in the possession of the client. American Federation of Tobacco Growers, Inc. v. Allen, 186 F.2d 590, 592 (4th Cir. 1952):
... it is manifest that the court's power in the premises is no less merely because one of the parties before the court has taken the funds into its own possession instead of having them paid into the hands of the clerk.
In this case the Court used its injunctive powers to require the parties to transfer the C&R 8พ% bonus fee which Rectifier had effectively paid to C&R in 1975 and which C&R had posted in escrow as security for the indemnity which is at issue herein, to the Minnesota Bank in order to maintain the status quo pending resolution of those issues.
The power of this Court to do so by issuing a mandatory temporary restraining order, without notice, in the circumstances of this case is clear. In Re Uranium Antitrust Litigation, supra; Matter of Vuitton et Fils S. A., 606 F.2d 1, 4-5 (2d Cir. 1979).
Rectifier asserts that injunctive relief cannot be employed where the dispute involves only the payment of money, since a money judgment at a later date precludes irreparable injury in the interim.
That nonsequitur is fully answered in In Re Uranium Antitrust Litigation, supra; Matter of Vuitton et Fils S. A., supra, where ex parte injunctive relief was granted to preserve the funds pending adjudication of the plaintiff's entitlement to a monetary judgment and by Grimes v. Chrysler Motors Corp., supra, and Andrews v. City Central Surety Insurance Co., supra, where in ancillary attorney-client fee disputes the courts required the deposit of the settlement funds into the court to protect the petitioner's enforcement of an ultimate money judgment.
The same standards which apply to the issuance of a temporary restraining order also apply to the issuance of a preliminary injunction. Chicago Great Western Ry. Co. v. Chicago B&Q R. Co., supra.
Rectifier quotes the four factors authorizing temporary and preliminary injunctive *661 relief, citing Dataphase Systems, Inc. v. C. L. Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) as follows:
... (1) a threat of irreparable harm to the Plaintiff; (2) the state of the balance between this harm and the injury that granting the injunction on other parties litigant; (3) the probability that Plaintiff will succeed on the merits; and (4) the public interest.
Petitioners agree that these are the relevant considerations and have heretofore cited Granny Goose Foods Inc. v. Brotherhood of Teamsters and Auto Truck Drivers, etc., 415 U.S. 423, 439, 94 S.Ct. 1113, 1124, 39 L.Ed.2d 435 (1974) and Dow Chemical Co. v. Blum, 469 F.Supp. 892, 901 (D.Mich.1979), for that very same proposition.

Factor 1: Irreparable harm to the plaintiff.
Of the three threatened and potential actions and proceedings described in the Petition and the affidavit of Peter R. Cohen, the most serious appears to be Rectifier's intent to file a Chapter 11 bankruptcy proceeding under the Bankruptcy Code.
Rectifier does not deny that intent by affidavit or otherwise, but represented in the June 4, 1981, "Stipulation and Order" that it:
... has no intention of initiating such a proceeding or any other proceeding under the Bankruptcy Code prior to June 17, 1980.
To date, Rectifier has not denied that it intends to file a Chapter 11 proceeding if a damage award in the doxycycline case comes to pass. This Court has not been advised as to when the Court in that case will try the damages issues other than the assertion in Mr. Cohen's affidavit that this case, as distinguished from a California state court action, can be finally concluded before the potential award of damages in the doxycycline case.
At the hearing on June 17, 1981, Rectifier's counsel argued that Pfizer Inc. might have a claim to the escrowed funds, for damages awarded to Pfizer Inc. in the doxycycline case, as a general creditor of Rectifier in a Rectifier bankruptcy proceeding, citing Sanders v. Providence Washington Insurance Co., 442 F.2d 1317 (8th Cir. 1971). That argument supports the undenied assertion that Rectifier intends to file a bankruptcy proceeding in the event of a substantial monetary judgment in the doxycycline case.
The Sanders case was cited by Rectifier for the proposition that this Court's assumption of ancillary jurisdiction would interfere with the future jurisdiction of the bankruptcy court. The case is inapposite for several reasons, (some of which are explained above): 1. The issues raised by the Petition can be decided by this Court and may well be decided before any Rectifier bankruptcy proceeding is instituted. 2. A decision by this Court will also resolve the issue of whether the escrowed funds are the "property of the bankrupt" over which a bankruptcy court has any jurisdiction. 3. If this Court decides that the escrowed funds are the property of C&R, then neither C&R nor the escrowed funds will be involved in the bankruptcy and C&R will be saved the time, effort and expense of resisting any bankruptcy court's demand for the escrowed funds and/or the priority of C&R's claims to those funds against Rectifier's creditors' claims to those funds. The avoidance of those priority issues is one of the grounds for the exercise of this Court's ancillary jurisdiction as those issues will be mooted if this Court finds that the escrowed funds are the property of C&R irrespective of whether C&R or Rectifier prevails herein on the issue of whether Rectifier was obligated to release those funds upon C&R's demand in January of 1981. 4. If a Rectifier bankruptcy court proceeding is instituted before this Court's decision is issued, the bankruptcy court may well decide to allow the issues of whether the escrowed funds are C&R's or Rectifier's "property" to be determined by this Court, which will be substantially further along at that time than the bankruptcy court. Halpert v. Engine Air Service, 212 F.2d 860, 862 (2d Cir. 1954). 5. Indeed, this Court may require the bankruptcy court to determine the issue of whether the escrowed *662 funds are C&R's or Rectifier's property in this Court. Ibid. 6. If this Court defers to a potential future bankruptcy court proceeding and refuses to exercise its jurisdiction because of that potential proceeding, the same issues will be issues in a California state court action instituted by C&R against Rectifier. 7. If C&R's right to possession of the escrowed funds has matured, C&R should not be delayed in establishing at the earliest possible date its right to possession and actual possession. 8. This Court is in the best position to expeditiously and economically determine the property issue and the priority issues.
9. If this Court deferred to the potential future bankruptcy proceeding, the Court would be sanctioning the multiplicity of actions and the delay and unnecessary expense which ancillary jurisdiction is designed to avoid. Similarly, if the Court had not issued its temporary injunctions and the preliminary injunction, the same mischief which C&R assert might cause irreparable injury might have resulted. Rectifier could have instituted a California state court action involving the same issues which would have necessitated further injunctive proceedings in this Court. Rectifier could have advised RM&S of the pending Petition which would have also caused further injunctive proceedings in the Court. And Rectifier might have filed a Chapter 11 proceeding which would have initially raised the preliminary issue of whether the escrowed funds are the property of the Bankrupt or are C&R's property. If the bankruptcy court had attempted to gain possession of the escrowed funds before the "property" issue was decided, that attempt would cause further injunctive proceedings in this Court. As C&R's moving papers state, the California Bank would, undoubtedly, pay over the escrowed funds to the bankruptcy court upon Rectifier's instructions. If the bankruptcy court obtained possession of the escrowed funds, thereby temporarily cutting off the payment of income and interest to C&R, the status quo would be disturbed. Although the possibilities of irreparable injury to C&R are stated by the Court as a series of "ifs," those possibilities pose a real and present threat of irreparable injury to C&R which is more than just speculative in view of Rectifier's refusal to deny its intention of filing a Chapter 11 proceeding. Once filed, the string of possibilities might have become realities in one day's time. This Court's injunctions were and are necessary to prevent that threatened harm. This Court can protect the rights of all parties and claimants without the expense, delay and alteration of the status quo which those multiple proceedings could have caused.
Rectifier asserts that the "anti-injunction act," 28 U.S.C. ง 2283, prevents this Court from interfering with any California state court proceeding. That statute is inapplicable herein since this Court's exercise of ancillary jurisdiction does not, and will not interfere with any pending California proceeding.
28 U.S.C. ง 2283 states that:
A Court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments. [emphasis added]
The case law engrafts a fourth exception onto ง 2283; a federal court can always issue an injunction to prevent irreparable injury. Wulp v. Corcoran, 454 F.2d 826, 831 n. 5 (1st Cir. 1972).
This Court's injunctions are permitted by the express exceptions to ง 2283, by its engrafted power to prevent irreparable injury and also by its inherent injunctive powers. Wulp v. Corcoran, supra; Matter of Vuitton et Fils S.A., supra; In Re Uranium Antitrust Litigation, supra; Doe v. Ceci, 517 F.2d 1203 (7th Cir. 1975).
In addition, ง 2283 is applicable only to a case which is first filed in the state court and is inapplicable to the federal courts' injunctive powers where the federal court action was the first in time, the state court action was second in time and the state court action seeks by injunction or otherwise to interfere with the federal court's *663 prior jurisdiction, pendente lite injunctive relief, or ultimate judgment. Doe v. Ceci, supra; Pacific Telephone & Telegraph Co. v. Star Pub. Co., 2 F.2d 151, 153-4 (5th Cir. 1924).
Furthermore, the All Writs Act, 28 U.S.C. ง 1651(a) and the inherent equity power of federal courts confer upon the Court injunctive power to control the transfer of funds to maintain the status quo and to protect and preserve the Court's jurisdiction. In Re Uranium Antitrust Litigation, 617 F.2d 1248, 1258-60 (7th Cir. 1980):
With regard to the requisite threat of irreparable harm, it is evident that without the Court's use of injunctive powers the plaintiff's ability to satisfy the judgment would be seriously jeopardized.
The Court's injunctive orders do not place an onerous burden on the defaulting defendants [at p. 1261]
The "all writs act" and the "anti-injunction act" are therefore entirely consistent as applied herein.
C&R assert, and Rectifier does not deny, that the income and interest from the escrowed funds are necessary to support D. Riordan and her and E. Riordan's children and that both petitioners need that income and interest to defray the continuing expenses of the RM&S case in its appellate stage and to prepare for trial and try the C&R cross-complaint for an accounting. The affidavit of D. Riordan emphasizes that necessity and also explains that delay in deciding these issues is and will continue to cause insoluble tax problems for the E. Riordan estate, as follows:
2. The income and interest from the escrowed funds, held pursuant to the letter agreement of May 16, 1974 between Cohen & Riordan and International Rectifier Corporation, have been, are now, and will continue to be necessary and essential for the following purposes:
(a) To support myself and Ted's and my children during the pendency of the RM&S case and thereafter. Our children are: John, age 19 now attending UCLA; Laura, age 17; and Daniel, age 12.
(b) To defray the out of pocket costs (including attorney's fees, reporters' fees, etc.) during the pendency of the RM&S case.
(c) To defray the additional out of pocket costs (attorneys' fees, reporters' fees, etc.) which have been and will continue to be incurred by C&R in connection with the action in which this Affidavit is filed.
(d) To defray the out of pocket costs (including attorneys' fees, etc.) involving tax matters concerning the Estate of Edward J. Riordan.
3. It is respectfully requested that this court do what it can to resolve the dispute regarding the payment of the escrowed funds. I am advised by my counsel that if this court does not accept jurisdiction and determine the question involved, that the matter will then have to be resolved in the courts of the State of California. If the matter must be decided by the State Courts of California, I understand that the case will not be tried due to the congested calendar of the court in less than five years from the filing of the Complaint.
4. The federal and state taxing authorities have taken the position that one-half of the entire fee due to Ted Riordan from the escrowed funds must be taken into account in valuing the interest of Ted Riordan in the firm of Cohen & Riordan at the time of Ted's death. That one-half, if the government prevails, would add $514,285.00 to the value of the taxable estate. With the additional charges for estate and inheritance taxes being made, coupled with interest at 12 percent per annum (accruing at the rate of $63.51 per day for estate tax purposes and $23.67 per day for state inheritance tax purposes), the entire $514,285.00 will be used up by taxes and interest before five years from the date of this Affidavit.
5. In other words, if the federal and state taxing authorities' positions are correct (which we are disputing), it will make no difference whether the estate is right or wrong in the pending dispute with International Rectifier unless the *664 matter can be resolved promptly. If the matter has to be decided by the State Courts of California, by the time that court could rule in favor of C&R, all of the fees earned by Ted and attributable to the estate would be due for taxes and interest.

Factor 2: Balancing the threat of irreparable injury to C&R with the risk of injury to Rectifier.
Rectifier has been unable to explain why it has persisted in its efforts to prevent the transfer of the escrowed funds to the Minnesota Bank or why it persists in its attempts to have the escrowed funds retransferred to the California Bank. Rectifier admits that no harm can result from the escrowed funds being administered by the Minnesota Bank rather than by the California Bank. There being no conceivable harm to Rectifier by either the temporary or the preliminary injunctions, even a slight risk of potential harm to C&R by not having granted those injunctions tips the balance in favor of those injunctions. The showing made by C&R and discussed under Factor 1, supra, far exceeds slight risk and demonstrates immediate and irreparable threatened and potential injury. If Rectifier is able to demonstrate any threatened injury in the future, the Court has the power to consider any Rectifier application to modify the preliminary injunction. The escrowed funds can always be returned, if necessary, to the California Bank with the same dispatch and also without cost to the parties, just as those funds were transferred to the Minnesota Bank.
There being no conceivable harm or injury to Rectifier by granting the injunctions and there being serious and irreparable risk of harm and injury to C&R by not granting the injunctions, the Court's discretion and duty in granting the injunctions is clear.

Factor 3: The probability that petitioners will succeed on the merits.
As stated in the verified Petition and the accompanying affidavits, Rectifier concedes that the escrowed funds would be releasable to petitioners and Rectifier would have to release those funds if (a) the paragraph 4(a) C&R indemnity was not triggered by the RM&S $5.9 million judgment and does not extend to an appeal by Rectifier only and/or (b) there is no indemnity for any result in the doxycycline case after the main action concluded in August of 1975.
Rectifier insists that C&R must rely upon oral evidence "to modify the written fee agreements" in order to prevail on the merits. The Court disagrees. Both the Petition and the Cohen affidavit make it clear that C&R's primary position is that the May 16, 1974, fee agreement letter on its face and within its four corners, and also as interpreted by case law only, contains no implied indemnity for any result in the doxycycline case and exonerated the RM&S fee judgment when the RM&S California trial court judgment failed to reach the indemnity amount. Rectifier is confusing the alternative allegations regarding recission and fraud, upon which parol evidence is clearly admissible, with the primary count for enforcement of the fee agreement according to its terms.

A. The RM&S case fee indemnity.

C&R have alleged that:
Rectifier's trial counsel conceded on the record during the RM&S case trial that C&R's paragraph 4(a) indemnity would not be triggered unless RM&S received a fee judgment which exceeded $7 million.
Rectifier's trial counsel conceded during the June 10, 1981, settlement discussion that the RM&S judgment, with or without prejudgment interest, did not trigger C&R's indemnity, and even if construed to cover an appeal by Rectifier the indemnity was unlikely to ever come into play.
Only Rectifier appealed from the judgment in the time provided by law; after the time for a direct appeal expired, RM&S filed a protective cross-appeal only.
C&R and Rectifier intended that the paragraph 4(a) indemnity would end if an RM&S trial court judgment did not reach the threshold indemnity amount and only Rectifier appealed as the parties did not *665 intend that Rectifier could gamble on an appeal and a retrial for its sole benefit and at C&R's risk.
The paragraph 4(a) indemnity covers only liability imposed on Rectifier for retaining C&R and paying C&R for their retained future services. The RM&S case complaint did not attempt to impose any such liability upon Rectifier nor does the RM&S judgment impose any such liability. To the contrary, the RM&S judgment is for quantum meruit for RM&S legal services rendered prior to Rectifier's retention of C&R.
Thus if Rectifier relies upon the literal language of paragraph 4(a), there is no indemnity and, alternatively, if Rectifier agrees with C&R that the coverage is limited to an RM&S fee judgment, then the indemnity amount has not been reached during the term of the indemnity. (Including the judgment, prejudgment interest and Rectifier's reasonable attorneys' fee would still not trigger the indemnity coverage.)
The Court agrees that C&R's interpretation of the fee agreement is consistent with the language of the agreement, and the admissions of Rectifier quoted by C&R as to the agreement's proper construction also supports C&R's position on the merits. Other than the bare conclusions of Rectifier's counsel, Rectifier has offered no other interpretation of the fee agreement.

B. The claimed doxycycline case "indemnity-insurance policy."

C&R have alleged that:
When C&R demanded release of the escrowed funds on January 19, 1981, Rectifier for the first time "interpreted" the May 16, 1974, agreement to require a recomputation of C&R's 8พ% bonus fee at the final conclusion of the doxycycline case.
The preamble paragraph on page 1 provides that the C&R's obligation to render legal services in the main action and the related actions also ends therewith.
Paragraph 2.C.(2)(d) provides that when the main action is settled Rectifier will deposit C&R's 8พ% bonus fee in an interest-bearing account within 30 days thereafter as security for C&R's indemnity in paragraph 4(a) for an RM&S fee judgment.
The paragraph 4(a) indemnity covers an RM&S fee judgment only and no other indemnity can be implied.
Nowhere in the fee agreement is there any provision or implication that the 8พ% bonus fee was to be recomputed after the main action was settled for any later result in the doxycycline case or for anything else.
Paragraph 2.C.(1) provides that Rectifier can deduct only amounts paid to or awarded to an antitrust defendant in the main action or a related action prior to or upon the settlement of the main action in computing C&R's 8พ% bonus fee.
Paragraph 2.C.(2)(c) provides that only attorneys' fees incurred in the doxycycline action prior to May 16, 1974, can be deducted from the settlement amount in computing C&R's 8พ% bonus.
After August 14, 1975, the parties entered into an accord and satisfaction and a final accounting and agreed that the escrowed funds were at risk only for an RM&S fee judgment.
If the agreement can be construed to cover a money judgment in the doxycycline case and indemnify Rectifier against that judgment, Rectifier has exonerated the indemnity as a matter of law by involuntarily dismissing the antitrust affirmative defense in that case without C&R's consent and against C&R's advice. Rectifier does not contend that the paragraph 4(a) indemnity covers the doxycycline case, rather it construes the indemnity via its recomputation assertion, which results in indemnification without any other paragraph ever using that word or even a colorable synonym.
Again the Court must agree with C&R's construction of the fee agreement. The Court must also agree that even if, by resort to parol evidence, Rectifier could prove that the parties intended a recomputation of the C&R 8พ% bonus fee after the agreement was fully performed and thereby meant to indemnify Rectifier against a future judgment for damages in the doxycycline case, the waiver of the affirmative *666 antitrust defense would appear to have prejudiced C&R and that the implied indemnity was therefore exonerated. Again, Rectifier relies only on its counsel's pure conclusions, and Rectifier offers no favorable construction whatsoever.
The Court reemphasizes that the foregoing summary of the merits is a reiteration of the allegations set forth in the Petition and the Cohen affidavits. Rectifier has not yet stated its position. Unopposed, the Court finds that C&R's position on the merits does demonstrate the requisite likelihood of success on the merits.

Factor 4: The Public Interest.
The Court's exercise of its injunctive power does no disservice to the public interest, but to the contrary enforces the private attorney-general public policy of Section 4 of the Clayton Act, and the strong federal policy of Sprague v. Ticonic Bank, supra, by insuring that if the successful plaintiffs' attorney is entitled to his agreed fee or a reasonable fee from the plaintiff recovery which included attorneys' fees, there will be a fund from which to pay that fee. See Grimes v. Chrysler Motors Corp., supra, and that the successful plaintiff will not defeat the attorney's rights to a fee or the ultimate judgment of the Court by placing those funds beyond the reach of the Court. In Re Uranium Antitrust Litigation, 617 F.2d 1248, 1251-61 (7th Cir. 1980).
Accordingly, IT IS HEREBY ORDERED That the preliminary injunction issued on June 22, 1981, shall remain in effect according to its terms and that Rectifier's motions to vacate the Court's injunction, to dismiss the Petition and to transfer this case to the District Court in California are denied.
NOTES
[1] Section 4 of the Clayton Act, 15 U.S.C. ง 15, provides that: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorneys fee." (emphasis added)
[2] 28 U.S.C. ง 1404(a) provides that: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." See Pfizer Inc. v. Lord, 447 F.2d 122 (2d Cir. 1971).
[3] The parties' joint exhibit 12 to the hearing on the order to show cause re preliminary injunction on June 17, 1981, before this Court entitled "Memorandum of Points and Authorities in Opposition to [the antitrust defendants'] latest Memorandum Opposing a 28 U.S.C. Section 1404(a) Transfer and a Rule 42 Consolidation of the International Rectifier Case."
[4] The Escrow Instructions provide that the instructions of both Rectifier and C&R are required to release or transfer the escrowed funds. C&R had previously instructed the California Bank to transfer the escrowed funds to the Minnesota Bank.